Good afternoon, and may it please the Court. My name is Jonathan Landers, together with Seth Kretzer. I represent Kerry Allen. He's the petitioner in this case. I would like to spend the majority of my time today discussing the funding issue, and then maybe move on to the Juror-Berg, impartial juror issue, and then Mr. Kretzer is planning to discuss the funding issue. The District Court's ruling requiring Kerry Allen to prove his ineffective assistance of counsel claim prior to granting funding to investigate that claim creates substantial risk that meritorious, ineffective assistance of counsel claims will go unheard and uninvestigated. The danger with such a holding is that state habeas counsel can effectively insulate trial counsel's ineffectiveness, ensuring that no review will ever be had on the merits. I don't know that you need to prove it, but surely you need to show that you've got some hope of being able to prove it, don't you? I would agree we have to show some hope. What kind of showing? Don't you have to show, at least come up with some, you know the witnesses that you say should have been called? I mean, did you have statements from them? Well, that's actually the important thing, Your Honor. We don't know the witnesses that should have been called. Well, you know the family members, don't you? We know their names. It's in our pleadings. It's never been disputed by the state. We never received any type of mitigation file from Alan Nunnery, who we know was the attorney handling the mitigation case for the defense. As a matter of fact, Seth Kretzer lives in the building he works in. We left letters on his door trying to get files. We never received anything. Well, but you know, typically in these kind of cases, we get statements from the witnesses that they expect to call. I understand. And we don't have anything like that. The way the investigation went in this case was, as defense counsel, we start reaching out to prior counsel. We start reaching out to the investigators. We know Gerald Baerbaum, one of the investigators, he's an attorney. He's the only person we have an affidavit from. From him, we learned there were people out there, apparently ex-lovers, family members, friends from the neighborhood, that could have verified that Cary Allen suffered physical and sexual abuse. Apparently, there was also records out there that could have verified, and this didn't come up in the trial whatsoever, that he had some mental deficits. The problem is we don't have those files. We don't know what those files say. We had to go get the, I know you said you left letters, but did you go to the court or have him try to file? Without a doubt. We have looked at every single document that's in the district clerk's website, or district clerk's office. That's where we actually... By that I mean seek relief to make him turn over the files. In our supplemental briefing to Trevino and Martinez, which was the last briefing we filed, we specifically re-urged our funding motion. We also specifically pointed out, Judge Gilmour, we don't have to necessarily have the funding motions. Maybe we could be granted leave to conduct discovery in this case. We suggested that we could ask, on the record, Allen Nunnery to tell us where his files were or who was spoken to here. The issue with this case is, whenever you have these allegations of abuse that the family is letting go, the family knows about, it's not being prosecuted, it's not the type of thing that the family members, the people that know about, want to talk to an attorney to who's calling them out of the blue. Of course, Carrie Allen is from St. Louis. We would have needed somebody on the ground in St. Louis to go figure out what exactly happened here. I would also point out Lisa Milstein, another investigator at the trial level. She's mentioned in the funding records, which we found from the district clerk. A simple Google search of her name will tell you why we can't get a hold of her, and that's because she, after Allen's case, has been discredited because she was smoking crack cocaine with a witness apparently. So she's dropped off the face of the earth. And so, Judge Davis, to answer your question, I do think there's some showing that needs to be made that, number one, in this case, the claim is not procedurally defaulted. And that showing needs to be made that we somehow fit into Martinez and Trevino's framework. I believe that we've made at least a showing at that by proving, by funding records from the state habeas court, the state habeas counsel, that that counsel didn't investigate outside the record. We do know there was an investigator. It's clear from the funding records that he was investigating record-based claims, claims that are in the record about the jury moving their cars during deliberations, claims about things the trial court said when making rulings on evidence. Nothing outside the record was investigated by state habeas counsel. I also don't think there's any doubt that whenever the state writ was filed, the ABA guidelines, the subsequently written Texas guidelines, require habeas counsel to investigate both the punishment phase and the mitigation phase. And that didn't happen in this case. And possibly because that didn't happen, that might be why we don't have trial counsel's files related to mitigation. So essentially, what we have here is somewhat of a blank on what investigation was done. I would point you to this court's decision in rehearing I think it's cited in our brief. I think it's very helpful for this case. I think it provides the framework that we should use for deciding what type of standard needs to be met in order to get funding. In rehearing was a case where an Atkins claim was brought up after Atkins had been decided. At the initial writ level, Atkins hadn't been decided yet. After it had been, the federal and the state proceedings had finished, Atkins came out. And so the question was, could Mr. Hearn be appointed counsel in a subsequent writ? Of course, in order to be entitled to counsel, he had to make a showing of some sort that number one, he might fit into the Atkins framework. Number two, that the claim could be heard on its merits. Those are the two showings. This court found that the showing would be some colorable showing. They later mentioned, the panel in that case mentioned, that this is a modest evidentiary threshold. So I think we've established potential Martinez-Trevino type issues based on habeas counsel. The question is, and I agree with this, did we have any proof that trial counsel might have been ineffective in their investigation or in their presentation of mitigating evidence? And I think the Baerbaum affidavit, coupled with the jury instructions and the fact there's a three-day jury deliberation on mitigation in this case, gets us there. Baerbaum seems to say, and it doesn't seem to say, in his affidavit, he points out there are witnesses out there that knew these things. Through the interviews, and this is from the Baerbaum affidavit, through the interviews of family members, neighbors, and paramours, Ms. Milstein and I discovered some testimony that supported the physical and sexual abuse Allen suffered. The question is, what was that evidence? We don't know that. And who are these people? Could they have been here to testify? Those are things we don't know because we need an investigator to go out to St. Louis and figure out who was spoken with. If they weren't spoken with, would they have came and testified? And whether or not they actually, you know, when did they speak with trial counsel? When did all of these things happen? Those are all questions we don't know. I don't know why your client wouldn't know what family members could be potential witnesses. He would know some of them. It's him telling us who these people are, and then someone actually getting a hold of these people. Especially if you read the Baerbaum affidavit, it makes it rather clear that once the kind of scope of the evidence had come out at trial, whoever these people are, whoever these family members are, they didn't want to show up. And it's understandable. They may not want to show up for you either. They might not, but that's the thing is we don't know, Your Honor. And not only that, we don't know who was discussed. I mean, did you try to call them and get contact with them on the phone? One family member would speak to me on the phone. And yes, we did try to call some. Some we were not able to find. Now, I would point out that, and I know this Court is more than familiar with what mitigating investigators do, these mitigating specialists. They're trained to, number one, find people. It's much better, and I know this from whenever I was a fellow in law school and I worked with an organization that did these types of things. You need to send somebody out there on the ground. You need to have the personal touch to go out there and get these people to talk to you. And these are what mitigating investigators are trained to do. That's specifically what they would do. And I would simply point out, Your Honor, that in this case, although the facts of the case, you know, the guilt and innocence case are definitely horrible. No one doubts that. The jury deliberated for three days on the punishment issue. And then we know for a fact, and I've got it printed out here, the prosecutor urged the jury to completely discount the testimony from Bettina Rice. She was the specialist that got into all of the sexual abuse, physical abuse. It all came in through her. Nobody else that testified knew anything about it. In closing, the prosecutor told the jury, the only way there is even mitigation of any kind is if you believe his sheer statements to the interviewer. That's Bettina Rice. That's because Bettina Rice had testified on cross-examination. She didn't actually interview any of these family members. We didn't have anybody there that could have explained what the family members actually said. And the reason we know it's important is in the clerk's record, we have jury notes written from the foreman of the jury. The first jury note says that, and I'm going to read them. They're somewhat hard to read. We would like to read the testimony notes and supporting documents presented during Bettina Rice's testimony. In Texas, most places, you can't just ask. We'd like to see all this. So the judge directed the jury, ask specific questions about this. So the jury writes back, disagreement exists among the jurors as to whether or not Bettina Rice herself, underlined twice, interviewed any of the defendant's family. We have a similar question asked immediately afterwards. I think there's one more. These are all asked on the second day, full day of deliberations. We come back into court the next morning, the third morning, and the answer is read back to the jury. This is the only answer read back to the jury at that time. Question, this is a question from the foreman. Members said that he is just a flat-out liar. Would you believe them? The answer from Bettina Rice, I've never spoken to them. Almost immediately, we come back with a death sentence. The point is, yes, Your Honor. So would this be a different case in your mind if there had been no cross on that and it would just, and the argument would have been made straight up. So what, he was, you know, it's unfortunate that he was abused, but he still should get the sentence. If it had been argued that way, instead of questioning his credibility, would there still be the same need for these funds? I believe it would, Judge. This simply shows us what the jury was thinking in this case. It's the only thing, the only notes we possibly can, you know, guess at what they're thinking. But our position is that if you have a potential, I would say a colorable showing, that you fit into Martinez and Trevino. I think you do that by showing what State Habeas Council did or did not do. Then, as long as there's, you know, a modest evidentiary threshold, you should at least be entitled to that $7,500 that's envisioned by 3599. You know, as Federal Habeas Council, Mr. Kretzer and myself and all of us have to decide where to use our resources. And quite frankly, $7,500, it's not a lot of money. And I know that this Court sees requests for much higher amounts, but we simply want to get our foot in the door and figure out what was missed here. We can always come back and ask for more later on, but all we requested was $7,500 in light of Martinez and Trevino, in light of the facts of this case, to look into these things. How do you distinguish our opinion, or should we disregard our opinion in Kretzinger? No, I don't think you need to disregard that opinion at all. First off, I would point out that in Kretzinger, the initial funding was requested pre-Trevino, and then it was never requested again from the way I read that opinion. We requested ours post-Martinez-Trevino. Now, of course, we've been building up towards this throughout the entire litigation, but we specifically requested the mitigation funding then. Another thing I would point out is in the Newberry case, which is different, but similar, this Court and apparently the District Court believed that there were sufficient facts to make an informed decision on the merits, and that is a quote from Krestinger. And Krestinger did not contradict this last point. That's the point here, is we believe we've made that showing, enough of a showing, to need an investigator. Did trial counsel get any investigative money? We know they did, because Gerald Baerbaum was there, and so was Lisa Milstein. What we don't know, and what's missing, is who spoke to who, what was found by those people. We know from Gerald Baerbaum that there were people out there, he seems to recall, that could support this evidence specifically, the sexual abuse, the physical abuse, and the mental deficits. No mental deficit evidence was presented at trial, by the way. So, the question is, what was that evidence? Why didn't these people show up? Mr. Baerbaum seems to recall they were, at the last minute, the defense figured out they weren't going to show up, and so they'd run out of time to subpoena these people. That's the only evidence we have. That's the reason this is the only claim we brought. But I would point out that in our initial briefing, Mr. Kretsinger and myself were appointed with about 80 days left on the epoclock here. We were permitted to file a skeletal writ, a placeholder writ, to preserve our issues. We preserved a much broader range of mitigation issues than this, but this is the only evidence that, by ourselves, we were able to bring forward. Tell me again why you couldn't get counsel's file? It was never produced. We repeatedly tried to get the file. We asked for discovery to have them either turn the file, and this is in our final trivenial briefing, we said, in the alternative, order trial counsel to turn over the mitigation file. And for the record, I do want to be clear, we have a guilt-innocence file from Skip Cornelius. We don't have any mitigation file from trial counsel. I mean, you ruled him in, ruled to show cause, why it shouldn't be brought right to the courtroom? We requested discovery, which we have to, I believe, request in the habeas rules, and in that, we told the court, you know, you don't have to give us the mitigation investigator. We could order Mr. Nonnery to produce the file, or maybe have him do some written interrogatories. I forget exactly what we suggested. It is in our additional trivenial briefing that we filed at the end of this case. But the court didn't rule on the motion? Did the court deny the motion? Our funding motion was taken up, so we filed it after trivenial. After Martina's trivenial, the district court requested additional briefing from us and the state. We asked for more time for that briefing, and we filed immediately a funding motion. The funding motion was, then we finished up our Martina's trivenial briefing. The trial court never ruled specifically, separately on the funding motion. What the trial court did in the . . . What about the discovery? To say . . . No, no, no. You should be able to subpoena the file. That was all . . . So, did you, did you seek clarification from Judge Gilmour? Not after the ruling. I mean, I'm sort of, Judge, you need to let me get the file. I need the file. I think we made that pretty clear in our briefing, Your Honor. And then the way the ruling went was it addressed, essentially, the merits of the IAC claim we were able to raise, addressed those on the merits. It then said, because we didn't meet, we didn't prove it on the merits, we weren't entitled to trivenial on Martina's, and we weren't entitled to any further evidentiary development. So, what is the standard that you believe is applicable? If you don't believe you have to be able to establish it on the merits, what threshold level is required? I would, I would look at that Henry Hearn case. That's the standard? I believe that case is analogous, and I think that is a workable standard. It requires a showing, it requires some evidence, but it doesn't require you to prove your entire case before you do the investigation. Okay. Thank you very much. Mr. Kretzer? Good afternoon, Your Honors. Seth Kretzer. As Mr. Lander stated, I do wish to spend the apprendi ring argument, if I could just briefly follow up on a couple of points that Judge Elroy was asking Mr. Landers. I would point out that not only did Mr. Nunnery never file an affidavit that he had been ordered to file in the State writ, we tried going about this yet another way. If you look at the Bettina Wright testimony, she had testified about what she had heard from the investigators who had been sent to St. Louis with regard to these family members. The State, when they went to cross-examine her, there was a break in the trial for them, upon the prosecutor's request, to review those notes. Now, the transcripts are not time-stamped. I can't tell you how long of a break they took, but we do know the jury exited for at least some period of time of a break, and then they came back in. Those are the most important source documents, Judge Davis, that would otherwise give us the information that, as Judge Elroy suggested, would ordinarily be found in a mitigation file. One other thing we tried to do this, over three years ago, we spent an entire day at the Harris County, the library. We did a file review. Ms. Heining and two associates from her office, Mr. Landers and I, and we reviewed the entire State's file. We thought perhaps those documents might have ended up in there since the prosecutor had taken them to review, but they were not there either. So we did everything that we could do, without getting any expert funding, to go about getting this information. And just real quickly, Judge Davis, we would like to point out, of course, that we are talking here about incredibly sensitive stuff, incest in the family, sexual abuse, things like that. Those are not things that people are likely to discuss with some stranger calling on the phone just because I say I've been appointed to represent, you know, your relative Carrie some 10 years later, and I certainly don't have the resources at the hourly rate, you know, that we charge at the CJA to drive to St. Louis and spend a week up there or something like that. That's what was really so necessary. So to answer your question, Judge Davis, if there is some showing, we submit that under Martinez and Trevino, if those two cases are to mean anything, if there is some showing of a credible IEC contention, you have to be required to give them some de minimis amount of money. It's a chicken and egg problem. If not, then the result — I would actually argue is perverse. The state habeas lawyer — now, if that state habeas lawyer is susceptible to IEC arguments under Martinez and Trevino, he's actually incentivized not to do any mitigation investigation, like happened in this case, rather than just do a little bit, because if there's not successor funding for it, then no one will ever look at his performance either. It's two different levels of a perverse incentive for this conspiracy of silence. Is our counsel still practicing in the area? Yes, he is. As we mentioned, he — we went to his office. He still practices in Houston. We tried him numerous times. Mr. Landers, we wrote that in our brief directly. He saw him at the courthouse, the State courthouse, right after we were appointed. And we also left a note on his door at the time I lived in the same building that he officed in. To answer your question, Judge Davis, yes, he does. I even watched him. Why couldn't you notice his deposition and have a subpoena do some state commission for him? You have to get leave in habeas litigation. Discovery works entirely differently. You have to go about — But you get leave for that? As we mentioned, we requested all of this. We never got a ruling. Did you ask to, say, take his deposition and have a subpoena do some state commission for his file? We put arguments about getting discovery from him. I mean, did you ask for that? That's what I'm asking you. I have to go back and — I'll pull the exact and get it for rebuttal, exactly what we asked for. I don't want to say something that's incorrect. I know we did request leave to take discovery from him directly. But I'll get it. It's on my desk there. I'll get it and hand it to Mr. Landers for the rebuttal so I don't misstate anything and we can show you the exact page size of where we asked for it. So, turning to the Apprendi-Ring argument, Your Honors, we would submit that the court abatability among jurists of reason about our Apprendi-Ring argument does not arise from the fact that Judge Gilmour twice referred to our argument as novel in her order, novel in the sense of being a first-mover advantage or disadvantage in her view, since the argument had not been made before a line of facially contrary cases came out from this court, like Sprouse and Blue and three of the cases that Ms. Hynding cites in her brief. But I think the court abatability really impinges on that distinction which Professor Dworkin talked about in Law's Empire, the difference between concept and conception. The concepts of Ring and Apprendi, now some 15 years later, are quite venerable. Anything that raises the functional maximum sentence above the — where it would otherwise be has to be proved beyond a reasonable doubt to a jury. And yet the conception is somewhat different. The prior cases from this court rejecting the Ring-Apprendi challenge to the treatment — the evidentiary burdens in the Texas special issues involve a situation when people were arguing that the government had to bear beyond a reasonable doubt disproving the Petitioner's mitigation evidence. That's not our argument at all. We would argue that not only is our argument qualitatively different, it works logically and perfectly fits that line of cases. I thought you had a question. I just don't understand why — I don't know — Channette does not govern the case. I just don't understand. Sure. Our argument would be this, Your Honor. Maybe I can — let me show you — there was a case that issued exactly one week after Judge Gilmour authored her memorandum opinion last year, cited in Ms. Hynding's brief. This is the Sprouse case, S-P-R-O-U-S-E. In a series of three footnotes, footnotes 8, 9, and 10, Judge Smith shows — the argument here was that the jury wasn't told how to, you know, appropriately weigh the evidence when, of course, Texas is not a weighing State. But in that case, Judge Smith went to pains to show how the prosecutor repeatedly stated the standard correctly. He said the defendant has put on this mitigation evidence and you can credit her if you want to, but we suggest that you shouldn't. In Ms. Hynding's brief, if you look at page 41 of her brief, she resists or countermands my argument by saying that evidence that was not adduced, that was a prior bad act, uncharged conduct, such as she says the fact that he used the church as a facilitator of evil or used his religious background, things like that, she has a series of elements she lists, that those things even if — would still nevertheless be relevant to future danger, which of course still has to be proved beyond a reasonable doubt under Article 37, the Texas death penalty statute. Here, though, Judge Elrod, the evidence came out very, very differently. I would ask you to look very specifically, I have at my hand page 60 of the punishment phase closing argument. And this is the prosecutor. Ms. Hawkins and Mr. — Ms. Austin, these are the reverend and a friend who did come down from St. Louis, testified — go back to quote — testified in punishment about the Cary Allen they knew. There are some people who probably consider the fact that someone is loved to be mitigating, someone loves him, someone cares about him. I suggest to you that comma, in fact comma, it's aggravating. In other words, what the state here was trying to do was hoist Cary Allen on his own petard. They were trying to take evidence that he had adduced as mitigating evidence and say, no, really, there it should be regarded by you as aggravating. We submit, Judge Elrod, that is a paradigmatic example of why jurors need to be reminded that evidence adduced by the state has to be proved beyond a reasonable doubt. And my argument doesn't just rest on one stray statement during closing argument. I have here in my hand the punishment phase jury instructions right here on the first page. Quote, in determining your answers to the questions comma or special issues comma submitted to you, you shall consider all the evidence submitted to you in this whole trial. In other words, there is nothing, nowhere — I understand the Texas death penalty statute is structured such that special issue number one, the future danger has to be proved beyond a reasonable doubt. There's a separate clause regarding prior bad acts. But that's not how the jury is instructed. They're instructed even when you get to special issue number two to consider everything. And here you see the government even went — the state, rather, went a step further and tried to fight back using his own mitigating evidence against him. It's our contention that that is required. But they're already down aggravating circumstances. Well — So the fact that the lawyer says, and this is aggravating too, they had already made that determination. Well, yes, Your Honor. My argument, I guess, here would follow in two steps. First is — and this would be more the Apprendi-specific portion of the argument. At the point — the past cases of this Court have reasoned that upon conviction at the guilt-innocence stage, the maximum is death. The exact language from Apprendi, quote, a defendant may not be exposed to a penalty exceeding the maximum he would receive if punished according to the facts reflected        The maximum is death. The maximum is death. The maximum is death. The maximum is death. The maximum is death. that guilt-innocence phase jury verdict is returned, the presiding State district judge cannot sign a judgment of death. There are a series of conditions that have to happen, both positively and negatively, before a death verdict can be rendered. One of the few actual IAC arguments that the State writ lawyer, who of course we claim was completely ineffective, raised was about the jurors who wanted to move the car and the fellow who wanted to go attend his wife's graduation. If those jurors had been hit by a bus or something, if for some reason they were killed, that jury would not have been able to reach the unanimity requirement or impose a death verdict. I thought in the guilt phase, the jury finds the two special issues beyond a reasonable doubt. Not in the guilt phase, Judge. That's not until punishment phase. They don't decide that in the guilt phase? No. The special issues are not brought up until the punishment phase. You're given the guilt determination, and then you get to, you have the brand new trial, the brand new opening arguments. They don't have to, well, if it's in the punishment phase, don't they find the two special issues beyond a reasonable doubt? No. That's what we argue should happen. You have to find, under the statute as it's structured, they have to find the future dangerous issue beyond a reasonable doubt. Mitigation, though, there's no eventual conduct given. It's our argument, Judge, that within mitigation, if the State wants to take the concept that is always maintained, the exact word Ms. Hynding uses in her brief, is the mitigation special issue and yours to the defendant's benefit. If the State just wants to sit there and let the defendant, you know, put on his mitigation evidence and tell the jury, go figure it out, that's one thing. That's not what the State does in practice, Judge Davis. What they do is come out swinging. They cross the trial. They cross Ms. Wright, my God. But they come out and do a substantial amount of evidence, aggravating evidence, evidence that they think is aggravating, to fight back, to counterman the mitigation case. That, Judge Davis, that crucial element, the thing that the only thing between the findings the jury has made thus far and the death penalty is mitigation, and the State chooses to fight back. It's our contention that they are going to fight back in that way, that they still bear the beyond a reasonable doubt requirement that they've brought to the other stages. Yes. But after they find the future dangerousness, then the defendant's eligible for the death penalty. No, they still have to go through mitigation. All right. But I mean, let's say they found future dangerousness, and the defendant says, I don't have anything to offer, and the State says, I don't have anything to offer. Couldn't the judge impose the death penalty after that? I don't believe so, Judge. I have Article 37 right in front of me, and I'm pretty sure that it still requires a finding as to special issue number two. I'll look at it more, and we'll get the exact answer for you in rebuttal, but . . . I mean, as I understand it, the mitigation gives the defendant a chance to avoid the penalty that he's eligible for. In other words, this is something that . . . this is a benefit to him to give him a chance to avoid the death penalty. Yes. And if he doesn't want to put anything in, and it's just submitted to the jury without any evidence going in on mitigation, they can come back and return a death verdict. I'll look at that more carefully, Judge. I have never seen a death jury verdict in Texas that did not have an answer to special issue number two, but I'll look at the structure of the statute, and we'll get that for you on rebuttal. Be that regardless, even if a defendant did say, I don't want to put on any mitigation whatsoever, that might be a different situation. The situation here, there's no doubt that they have Bettina Wright, they have the people who came down from St. Louis, the preacher and so forth. There was mitigation. We can't find the file to see what they did to investigate, so we can investigate it further. But there's no doubt that the State actively sought to resist by fighting back against the mitigation evidence by arguing that not only things that weren't directly relevant to future danger suggested that he negated mitigation, but moreover, they specifically even said the fact that he was loved by somebody showed that that should be regarded as an aggravating factor. The State was still talking about aggravating, even when the defendant was talking about mitigation, which he chose to do in this state. And all we would say is simply that it's a matter of constitutional law that the State should continue to bear the burden beyond a reasonable doubt if we're going to reduce that sort of evidence. I see my time has well and much expired, so I apologize. Thank you, Mr. Hine. Okay, Ms. Hine. Good afternoon, Your Honors. My name's Tommy Hine, and I represent the Director, William Stevens, and I'm here to ask that you deny a certificate of appealability on all claims. Regarding his request for funding, the standard under 3599 for funding on a habeas claim is whether it is reasonably necessary under the circumstances. Whether it's what? Whether it is reasonably necessary under the circumstances. And in this case, he didn't prove that it was reasonably necessary. The issue— We have to show it's reasonably necessary. It's up to the court. It's within their discretion to determine whether it's reasonably necessary. It's not a super high standard. No, it's not. And so, why isn't the N. Ray Hearn a good guideline? N. Ray Hearn, I guess a colorful showing, it's probably a comparable standard. I don't know exactly—that one involved an Adkins claim, which that's a little bit different, and—but in this case— Is it sort of reasonably necessary where he can't get the mitigation file and that he ought to be able to go back and do some due diligence? Your Honor, if he can show that there's actually a claim out there that he could prove if he got this file, then yes, that would show that it's reasonably necessary. Well, he shouldn't have to show—in your brief, I think it says he has to show by clear and convincing evidence before he ever—he shouldn't have to show that he can prove the claim. He just has to make a colorable claim, right? Right. And in this case, he can't even make the colorable claim. The claim before the court was that trial counsel was ineffective for failing to subpoena these witnesses and force them to come and testify at trial. That's the claim that he raised. And what he has alleged is that counsel didn't investigate. Well, counsel did investigate. They hired an investigator. They found these witnesses. They intended to present a defense. They hired an expert to support their defense. And when it came time to call them to trial, the witnesses heard what the defense was. This is from Joe Bierbaum's affidavit. They heard what the defense was going to be about sexual abuse, and they refused to cooperate. Right, but they could still subpoena them. They could still subpoena them. And then when they got there, hoped that they told the truth if it was, in fact, true. But would a reasonably competent attorney put witnesses on the stand who refused to cooperate, who don't want to help? Well, you could go ahead and subpoena them and get them here, and then see if they changed their tune. Well, that could have been... What seconds before they went on the stand? You would go ahead and subpoena them, so you wouldn't be in the ditch, would they live far away? I think in this instance, it was reasonable for counsel to assume he didn't need to subpoena them. They were his family. Don't you think he did need them because you, the prosecutor, not you, but the prosecutor impeached the Bettina, I'm sorry, the last name. Bettina Wright. Thank you. Do you think that such the impeachment and that the jury was so interested in this would make you think, boy, you do need to buttress it because it's not going to just be evidence that goes by and no one cares about? Well, first of all, Bettina Wright's testimony indicated that she based her opinion on what Cary Allen told her. She interviewed him. He told her he had been sexually abused as a child, and she believed him. Now, she is an expert in her field of sexual abuse survivors, and she said, I don't base my opinion just on what he tells me. I base my opinion on the way he tells me, on his emotional affect as he's telling me. I base my opinion based on my experience and what I know about sexual abuse survivors. And in her opinion, given what he was telling her, she believed that he was telling the truth. Right. But then the prosecutor argued in closing argument that you got to believe her in order to make that case, kind of put some question in the mind of the jury, and then the jurors did have a question in their mind. So it would have been really helpful to have buttressing witnesses. There was one witness that buttressed him. On cross-examination, his ex-wife was testified whether she had been told he had ever told her anything bad about his childhood. But told is different than knew. I would suggest that that is exactly the kind of evidence that we're dealing with right here. Gerald Bierbaum's affidavit suggests that there is some evidence out there to support that he had been sexually abused as a child. Bettina Wright's testimony read all of their interview notes, and she indicated that it was witnesses who were told that he had been sexually abused. There is no evidence in her testimony or in Bierbaum's affidavit that any of these witnesses actually saw him being abused or that they were the perpetrators themselves. In fact, the state cross-examined her on the point, well, didn't his sisters, didn't they see this abuse happening? And she said no. She didn't say no, but she said very rarely do you have an eyewitness to sexual abuse. Right. But if we don't know because we don't have the mitigation file, we don't have all the notes. I believe if she had that kind of witness in those files, she would have said it there on the stand. Bierbaum would have said it in his affidavit. There has been no indication that there's anything other than Kerry Allen told me that he was sexually abused. Nobody around him could have given that testimony. They could have given that testimony? Yeah. None of the witnesses would come to trial. I mean, that's where we're at. Well, but that's why you subpoena them ahead of time, not at the last second. And it may have been a misstep on counsel's part not to subpoena him, not to subpoena them in hindsight. But what we're dealing with was whether his representation was reasonable at the time and under the circumstances. And his overall representation was that of a reasonably competent attorney. He found these witnesses. He talked to them. They had every reason to believe they were going to cooperate. They were family members, and a reasonable attorney could believe that family members are going to help out their loved one who's on death row. Would it have been error to have granted the $7,500 for the initial investigation? I think it . . . I would never have appealed it as error, but I don't think there was a substantial need for it. I would have opposed it. This was all filed under seal, so I was never given the opportunity. Right, but under this reasonable and necessary or colorable claim, it wouldn't be error to grant it. I guess it wouldn't be error, but I think it would be a waste of time because you cannot prove the claim. Even if you interview these witnesses and find out exactly what counsel knew at the time of trial, if they don't want to cooperate, under Day v. Quarterman, you have to prove that witnesses were available and willing to testify. By their virtue of their refusal to come and testify, they were not willing to testify. Yes, you could subpoena them. Yes, you could force them to come to trial, but then they would be forced to take the stand and testify and basically as hostile witnesses. Would a reasonably competent attorney put them on? Furthermore, according to Bettina Wright's testimony, Cary Allen has a huge credibility problem. His family members didn't believe him. His family members called him a con artist and a liar, and they said you couldn't trust a thing he said. Would you put hostile witnesses who don't want to cooperate, who think your client is a con artist and a liar, when that is the cornerstone of the State's case, would you put them on as a defense witness? No, the problem is we don't know what they would say, and we don't know how hostile they would be, and that's what counsel really needed to investigate. What's your take on the inability of habeas counsel to get the trial counsel's file? Your Honor, what they've said in their brief is that it doesn't exist, and so if it doesn't exist, I guess now they're saying that they haven't been able to talk to him. I'm unclear as to what happened to this file. I don't know. If it doesn't exist anymore, it doesn't exist. Counsel do occasionally destroy their file. I don't know. I haven't talked to them. Where does it say that? It says there somewhere in one of their briefs, in a footnote, that apparently it doesn't exist. But the Court's ruling that implicitly denied their ability to get the file, if it did in fact exist, wasn't that— The Court's ruling suggests that even if they'd gotten this file, even if they'd interviewed these witnesses, it wouldn't have helped his claim, because what you have is an attorney who did a very thorough investigation. They found these witnesses. They knew who they were. So wouldn't the Court have allowed that file, if it ordered that file to be produced, if it did exist? If it isn't going to present a claim for relief, then that's—he hasn't proved it. But how do you know until you see it? We don't know. We just have to go on what we have, and the Court can look at it— But the Court could have given—gotten the other information, or else established that it didn't exist. The Court could have ordered it, certainly, and it probably wouldn't have heard had they the funds. And from what he presented to the Court, there was no substantial need. The claim was not meritorious. Apparently, the trial counsel talked to some of the family members, or his investigator did, and he thought they were coming to testify, so I would say that the inference is that he thought it was going to be favorable, and then they backed out at the last minute. So wouldn't you think habeas counsel should know who that was? We do know from Bettina Wright's testimony—it was his mother. It was two of his sisters, and there was an aunt named Doris Wilder, and some other family members. We do have names within the file, and you made a very good point that he could have tried to contact them. If they weren't willing to testify at trial, they're probably not willing to cooperate right now. And that's—it's what we're left with here. There's very little counsel can do if these witnesses don't want to help out. How do you know that you can say they're probably not willing to cooperate? Isn't it true that in these cases that after the fact and the person's gotten the sentence that they then are much more willing—don't we have lots of cases where they're much more willing to come forward then? Their willingness to come forward now versus their willingness to come forward at trial are two very different things. If they refuse to cooperate, counsel's not ineffective. He can't make them cooperate. He can force them to come to Houston and force them to take the stands, and they could potentially sabotage this case. They could sit up there and say, I don't know anything. Well, the case was already very difficult, so how much more sabotaging? Your Honor, he had a witness to back up what he said. He had a witness to say he was sexually abused as a child. Tina Wright interviewed him, and she told—from what Carrie Allen told her, and she believed him in her expert opinion that he was sexually abused as a child. She listed a number of people and a number of incidents in which he conveyed to her. This was very compelling testimony, regardless of whether it was cross-examined or not. She is an expert in her field, and she believed him, and she made her credibility determination based upon what he told her. Furthermore, she evaluated in the context of these witnesses who were not helpful. She evaluated in the context of the witnesses who didn't believe him, and she said that further buttresses her opinion of what happened to him, is that he was unloved, he was unvalued, because nobody protected him, nobody believed him, and nobody helped him. This cross-examination actually supported what she was trying to say about Carrie Allen as far as how he grew up to be who he was, as someone who didn't have a good support system, someone who was not able to cope with situations in life, was not able to cope with stressful situations, and sexually abused children generally tend to lash out at other children. It sort of happens—it's part of why he was who he was, part of why he became the person he was. So her testimony was actually very credible. Now it was subject to cross-examination. You can't avoid that when these witnesses would not testify, but the testimony would have been subject to cross-examination anyways, because it was predominantly damaged on the Every witness that Gerald Beerbohm and Lisa Milstein interviewed seemed to indicate they didn't believe him. They didn't believe anything that came out of his mouth. He had a credibility problem. That was part of the state's case, is that he had a credibility problem. He manipulated people. He took advantage of them. Which is why, precisely, they would be so benefited to have other people come in. And say that he didn't—he told me he was sexually abused and I didn't believe him. I mean, that's potentially the evidence we have here. Or perhaps somebody would, if he really was, say, yes, I don't want to admit it and I don't want to talk about it, but if you make me under oath, I will. And then on cross-examination, they would be damaged with the testimony that, well, do you think Kerry Allen's a trustworthy person? Do you think he's a con artist? Do you think— Well, that's already out there, so it might have been helpful to show that. But would a reasonable jurist conclude that this kind of testimony that would be cumulative, as what you're saying, of everything already at trial, would a reasonable jurist conclude, based on light of all of the aggravating and all the mitigating evidence the jury already heard, would they conclude that this would— It's not cumulative if it's a difference between told and heard from—I mean, and saw. There is absolutely no evidence that there's an eyewitness in this trial. Or knew of, because contemporaneously— The details can really be emotionally charged if they—and they don't even have to see it. If they talk about his reaction and he's asking for help and all that. You know, we don't know whether they can get that evidence or not, but it certainly wouldn't be cumulative if they could. It would be cumulative of what Bettina Wright testified to, that he did tell people and nobody believed him. I mean, they heard that, and then they heard from his ex-wife that he had been sexually abused. We also know that nothing ever happened. No one was ever arrested. I was only corroborating. And corroboration was key because the jury had a doubt, and we know that because of their note. But can I ask a question about the standard of review? I should know this, but help me on what is the proper standard of review for the denial of the funding request versus the— By this court? The denial of the funding request is separate from the rest of the COA, even though it's put in— They don't need a certificate of appealability. You just— Right. So what is the—the district court's denial of the funding request— You review it for an abuse of discretion. Just for a straight-up abuse of discretion with no deference—there's nothing hindering. It's just a straight-up, regular abuse of discretion. I believe so. Yes, Your Honor. Okay. The case is— And then the rest of the case is through the prism of the COA requirements. Pardon me? I'm sorry? The prism of the COA requirements, the rest of the case. Right. This is one issue that's off by itself abuse. I'm sorry. I just needed help with that. Do you have any comments regarding the COA requirements? The Supreme Court is—some of the Supreme Court justices have recently written on our Supreme Court justices have recently written in, I think, in Jordan v. Epps, or whatever it's called, about our being too—requiring too much on the merits for a COA, that we were getting too near the line on Miller-El, and that our standards are out of line. Are you not familiar with that? I'm not familiar with the rest of the case. It's just last week from the Supreme Court. So that's okay. I apologize. If there's no more questions about the funding issue, I'll touch briefly on the Apprendi claim. Essentially— Straighten me out on when the predicates for the death penalty, the special issues, that goes to the jury in the penalty phase? The special issues go to the penalty phase? Yes. Basically, we have an eligibility determination made during the guilt-innocence phase, and then a second eligibility factor is in the future danger phase. What are the eligibility factors in the guilt phase? The guilt-innocence determination itself. If they find him guilty of the elements of a capital crime. And those are the factors that make him eligible for death penalty. In this case, it was a child under the age of 6. But it could be killing a police officer, or rape, or robbery, or murder committed in the course of one of those factors. Those are the narrowing categories. And if they determine that he's guilty, that the state has proven all of those factors beyond a reasonable doubt, then they move on. That renders him eligible, but they also must find that he's a future danger to society. And that, the state is also required to prove beyond a reasonable doubt. And the jury is instructed that any extraneous offense or any other bad act must be proven beyond a reasonable doubt before they can consider it. Now, the mitigation special issue has never required a beyond a reasonable doubt. There is beyond a reasonable doubt instruction. There is no authority requiring that. Well, what would happen if the defendant, when it gets to the mitigation stage, the defendant says, I have nothing to offer. The state then wouldn't be able to offer anything else, would they? No, they can still, they're still entitled. The state presents their case first. They wouldn't be able to presumably offer any rebuttal evidence. It would just. If they go first, state goes first? Even if state goes first. On aggravating circumstances. Right, the state presents their case first. What if they didn't put anything on? If the defense didn't put anything on? No, no, the state. Then the defense could present a case where they could just rest. And what if they put nothing on? Then they could, they would go straight to the special issues and they would be required to answer all the special issues. And would it be, could the jury return a death verdict under those circumstances? They can, yes. Even with no evidence in that phase? Presumably. I don't think, I can't think of a situation where that's ever happened. I can think of one case. The only predicate required for the death penalty is that two special issues be established. Isn't that right? That's correct, yes. And then the mitigation is, gives the defendant a chance to avoid the death penalty. Correct. And of course, it can help the state, too, when they put on the additional aggravating circumstances. Right. What if we're, just assume arguendo, that we weren't comfortable with the decision on the funding, would, how would that work? If, would we remand for that and then remand the whole case in light of that to be looked at? Or would it be, we'd hold in abeyance the COA? Or, what happens in that circumstance? I presume you would remand for funding to develop the issue that was before the district court. That you'd rule on all the COA issues you could, that don't have to do with that, right? You could. I've also seen it held in abeyance. Or would you remand the whole thing back to? There would be no point to remand the whole thing back if you're going to deny COA on the remaining claims. Or if the remaining claims are unaffected by the funding. Right. So. The only issue. So you decide all the ones that don't have to do with that. And then remand the parts of the COA that do along with that issue. I'm just, how does it work procedurally? I assume that would be up to the court. I don't exactly know the procedure. I have seen it where they have remanded on one particular issue. I've seen where they've branded merits review on one particular issue and denied COA on the rest. You wouldn't remand the whole case if the court's review is not under, the court's decision is not under review or is not subject to any sort of further development. But you wouldn't be granting a COA necessarily. You'd just be remanding for further development. Wouldn't you have to grant COA in order to remand it? I mean, you'd be getting past the threshold issue. Whether it's arguable, you're saying it ought to go back, seems to me. Well, you don't need COA on the funding issue. That's only for an abuse. Oh, you don't have to have a COA on that. Just the funding issue, though. But if you're going to remand to grant funding on the ineffective assistance of counsel claim, I, it's. You don't have to grant the COA, though. You don't grant the COA. You just remand that issue back to be considered in light of the funding once it's, once the funding has been used or whatever. Correct. I presume that's correct. I'm, I'm not, that's kind of an unfamiliar territory for me. I've not seen that happen very often. So I think we interrupt you on your. Yeah, right. We were discussing the Apprendi claim. What we're dealing with here is there has never been a requirement that the burden of proof instruction be given to the mitigation special issue. The Supreme Court in Apprendi noted the difference between elements in aggravation and elements in mitigation and punishment. Precisely because the elements in mitigation allow the court to, or allow the jury to reduce the sentence from that allowed by the statute, that allowed by the eligibility determination. So therefore, there's no burden placed on the state to disprove these elements. This is simply allows the jury to consider whether a mitigation should be given. Now, in this case, the aggravating evidence in question is all part of the state's case on future dangerousness. The jury has to consider all of it in connection with that future dangerousness issue. He cited to my page 41 as elements that I've somehow made up. Those were actually taken from his brief in the district court. Those were factors that he cited as evidence that was somewhat outside of the future dangerousness issue, and I said, no, it's, it's clearly within the future dangerousness issue because it's all part of the state's case that he was a manipulator and he was a con artist, and he will continue to do so when he is in prison. As far as the, the witness's love for him being an aggravating factor, what they're saying is that he was, he was given support, he was given love, and he still became a capital murderer. He was, he took advantage of these people. He took advantage of their love by living with them and living off of them and not working, and these people cared about him and they loved him, but that was the state's rebuttal to that, is that this is what he does. He uses people. He's a con artist, and so that evidence is indeed aggravating. That is part of their future dangerousness case, and all of it is subject to the beyond the reasonable doubt instructions which the jury has already gotten. There is no evidence which is beyond those instructions. The cases that he cites involve victim impact testimony, which we don't have in this case. They said victim impact testimony has absolutely no bearing on the future dangerousness issue. But even those cases don't require a burden of proof placed on the mitigation special issue. There is no case law requiring that there be a burden of proof placed on that issue. There was a, there's a case that I cite in my brief, Ortiz versus Quarterman, which is similar to what, something which you've been talking about here. In that case he, he asked for a burden of proof instruction to be given on the mitigation special issue or he raised a claim arguing that it was unconstitutional not to get one because he didn't present any mitigating evidence at trial. So when the jury answered that special issue, they had only aggravating evidence to consider. And the court denied relief on that claim, finding that the prior case law, Shenette and Granados, didn't apply to, did not require the burden of proof instruction for the jury's consideration of aggravating evidence in that case. But they cite to a, they, they cite the lower court's resolution of that claim. And in it they cite to a state court case, Williams versus State, in which the state court held, because Texas law imposes the burden of proof upon the state to prove certain prescribed aggravating elements. A burden of proof need not be prescribed for the aggravating circumstances that might be considered in conjunction with the Texas' open-ended mitigation special issue. Now that's a pre-apprendee case, Williams versus State, but the state court has at least held that there is no burden of proof requirement even where, even for these aggravating factors that have to do with the mitigation special issue. They're covered under the instructions that are given. And in this case, the jury got everything, got all the instructions that they needed. The evidence was part of the future dangerousness special issue. And any suggestion that a burden of proof instruction should be required on this special issue would be teak barred, because it is not mandated by any authority currently existing. I have a few moments, he suggested that he wanted to talk about the juror claim, I presume he's going to talk about it when he gets back up. So I would like to just briefly state that the state court clearly and expressly applied a procedural bar when denying this claim. There is no evidence that it was intermingled or that they did not intend to. In fact, the court specifically stated that the challenge for cause to juror work is procedurally barred. In the alternative, they found. This court has held that they can do an alternative merits review if they clearly state that they're relying on the procedural bar. In this case, they did. The Supreme Court has said the same thing. There is no confusion here. They were relying on a procedural bar when they denied that claim. And furthermore, they did not object to this witness. They did not object to this juror. And if you go back and review her entire questioning, her entire examination, she was in fact a very favorable juror for them. And trial counsel had absolutely no desire to get her off the jury. They never once objected. They didn't ask that she be challenged for cause. They did not identify her as one of the objectionable jurors on their list of objectionable jurors. They said they were going to need extra strikes for. When it came time to exercise the final strike or when the final juror was picked, the state says it all comes down to this. The state accepts. Their response is the defense accepts. But we don't have any more strikes. The trial court did not interpret that as a request for more strikes. The trial court proceeded to read the juror's names. He read them twice. And then he said, are we all right, counsel? And to which the counsel replied, yes, sir. There was absolutely no attempt to object this witness, to identify her as objectionable. Whatever reason, this interaction between them, if you go back and review their testimony, it involves a very small part of her jury questionnaire, a very small part of her jury questioning. And counsel moved beyond it. He got her answer and he moved beyond it. Whatever else was contained in that questionnaire, which we don't know what her answers were, there were other questions involving race in that questionnaire. Whatever was part of that questionnaire and whatever happened on the stand, for some reason, trial counsel and the trial court were not troubled by whatever her answer is. They moved on and they had much, they asked her a lot, much more probative questions about her questionnaire. And her answers actually indicated a juror that was very favorable to them. She was a juror concerned about getting a presumption of innocence, that defendants don't get a presumption of innocence, that indigent defendants aren't treated fairly by the system. She indicated she would consider mitigating evidence that, when he asked her what kind of mitigating evidence she would consider, she said someone who was abused as a child or someone who had had terrible things happen to them that might explain why they, in turn, did that kind of thing to a child. She indicated she would hold the state to their burden of proof. She would not automatically answer any special issue. She would wait until she heard the evidence. She said a person could do a terrible thing and then never do another bad thing ever again in their life. She was a very favorable juror and everything in the record indicates that counsel wanted her on that stand and did not intend to object to her. And if there's no further questions. Okay, thank you very much. Thank you. Okay, Mr. Landers, back to you. Judge Davis, if I have some time, I'll explain my take on the whole statutory scheme in Texas. But I would like to get back to the funding issue. I agree that the reasonably necessary language is what's in the statute. If the funding is reasonably necessary, then it should be given to us. I would point out that McFarland, the Supreme Court case, as recognized in Hearn, makes it clear that's a low standard. As long as you can raise the claim, it's a relatively low standard. I would also point out some relatively recent cases regarding whether or not you should have a separate counsel in federal habeas in light of Trevino-Martinez. And there's a recent Fifth Circuit case, it's Mendoza. There's a recent 2015 Charleston versus Roper Supreme Court case. In Mendoza, this court specifically said, we're not deciding cause and prejudice at this juncture. Meaning you don't have to prove cause and prejudice before you'd be entitled to a separate attorney. The same issue would apply here. We don't need to prove that up front, we just need to show that colorable claim, we need to show it's reasonably necessary. And Christensen makes some similar arguments. And I would say the error in the district court's ruling comes down to this sentence, which is basically how the funding issue is disposed of. Martinez does not require the authorization of funds absent a concrete showing that an investigation would uncover admissible testimony that a reasonable attorney could and would have presented at trial. That's on page 32. The district court required us to find what it was we were going to find with the funding. It's circular logic, that's the problem. And the problem has been evident whenever we listen to this oral argument from both sides. We're all speculating on what we would have found. And the problem is we don't know what we would have found. And the other issue is, Mr. Kretzer and myself were obligated under the ABA guidelines, under the State Bar of Texas guidelines for capital defense, to investigate the mitigation case. And I assure you, we did what we felt like we could do ourselves. We simply need help. And- Did you get a hold of any of them on the telephone? His twin sister is the only person I could get a hold of. His mother, I mean, I don't know how much of this is even in the record from what I reviewed. But I believe there was probably some test, I don't know where I got it, but she travels around a lot. I don't know, I think she's some sort of a missionary. We might be able to find her. But it's my understanding there's still family in St. Louis. And quite frankly, I didn't know where to begin to find these people. Carrie doesn't speak- Were you able to talk to the twin sister? Yes. And she didn't know where the other people were? She made it clear the other family members didn't want to speak with attorneys. We need someone to go over there, figure out where they live, and knock on their door. And if they slam the door in an investigator's face, so be it. But at least whenever I go to bed at night, I know I've done my duty under the ABA guidelines and the state of Texas guidelines. She's not willing to talk to you about- We spoke some. And I don't want to get to things outside of the record. But she was able to verify the claims which are in the record about Carrie being conceived through a sexual assault. But beyond that, she wasn't able to verify a lot of things. But I would point out, which has already been brought up by Judge Elrod and by the state, credibility was the issue here. Can you believe Carrie Allen? So you don't have to have someone that witnessed that abuse to change the face of this case. After the state has impeached his credibility and brought up the idea on cross-examination with Bettina Wright, that all these allegations came out after the charge, and that Carrie Allen's this very smart and manipulative guy. That's essentially the cross-examination in the closing. Simply having somebody to come to rebut that testimony, Carrie told me about this years before, would have made a big difference. And Judge Elrod, you'd asked, I believe, if we had, what else we tried to do here. On the record, the ROA of 662, 663 is where we re-urged our funding motion. And we gave the court an out. We said there are, of course, other means of fact-finding which could be utilized by the court, and we suggested that Alvin Nunnery could answer written interrogatories concerning his investigation and failure to secure the witnesses. And further, the court could order Nunnery to produce his trial file. We did suggest those things in the alternative. Those were just dismissed by the district court. I think funding is the correct way to handle this. Finally, I would just simply end, I see I'm running out of time, with the fact that section 3599 is to be read expansively according to this court and the Supreme Court. It's not a statute of limitation. We weren't asking for anything over $7,500. On remand, I think it would be necessary for us to have a sufficient amount of time in order to investigate the case with an investigator, re-brief it. And I don't think that we are tied to the subpoena claim only. If we find more things, as long as they were preserved in our initial writ, we should be able to brief those. And we did preserve a broader, a more broad Wiggins claim in our skeletal writ. Those are all, they won't be time-barred. They were all raised previously. And that's our initial filing in the record on appeal. You'll see many different avenues, we thought. And- Wouldn't you have to go back to the district court after you investigate, if you- We would need to, at the district court, fully brief the issue after we had the investigator. Yes, we would. I think that's what has to happen. Mr. Landers, are you and Mr. Kress your court appointed? We are, Your Honor. The court appreciates very much your services to your client and to the court. Thank you, Judge. We appreciate your time today. All right. The argument, and the court stands in recess.